RETIREMENT BOARD OF REVERE *vs.* CONTRIBUTORY
RETIREMENT APPEAL BOARD & another.[1]

No. 92-P-498.

Suffolk. May 5, 1993. - February 28, 1994.

Present: BROWN, KASS, & LAURENCE, JJ.

*Retirement. Police*, Injury on duty, Retirement. *Public Employment*, Accidental disability retirement.

A decision of the Contributory Retirement Appeal Board awarding disability retirement benefits to a former police officer was unsupported by the record of proceedings before the board's administrative magistrate, where the magistrate's finding as to causation (as well as the conclusion of the regional medical panel on this issue) was inconsistent with the undisputed facts concerning the applicant's subsequent injuries not related to his public employment, and where the magistrate neglected to consider the claimant's refusal to undergo recommended surgery as constituting a cause of his eventual disability. [105-108]

A decision of the Contributory Retirement Appeal Board awarding disability retirement benefits to a former police officer was unsupported by the record of proceedings before the board's administrative magistrate, where the magistrate's finding as to the permanence of the claimant's disability rested upon her erroneous adoption of the proposition that a claimant had an absolute right to refuse available medical treatment that would probably eliminate the disabling condition unless the claimant could be guaranteed a cure without risk, and where, moreover, the record revealed no basis for the claimant's refusal to undergo recommended surgery. [108-110]

On an appeal from a decision of a local retirement board denying disability retirement benefits to a former police officer, the regional medical panel's certification as to the permanence of the claimant's disability was fatally flawed, where the panel's report did not bring to bear the members' expert medical knowledge to present a balancing of the risks and benefits attendant upon the medical treatment available and recommended to the claimant, and where the panel relied instead upon an erroneous legal conclusion that the claimant had an absolute right to refuse "surgical invasion of his body." [110-112]

Where the parties to a lengthy proceeding on a former police officer's application for disability retirement benefits in effect stipulated that no additional facts or opinions on the issues of the causation or perma-

---

[1]Alfred DiDonato.

nence of the claimant's disability were needed, remand to the Contributory Retirement Appeal Board was not required, and judgment was to enter in the Superior Court setting aside the board's decision. [113]

CIVIL ACTION commenced in the Superior Court Department on April 23, 1990.

The case was heard by *Catherine A. White*, J.

*Ira H. Zaleznik* for the plaintiff.

*Peter Aloisi* for Alfred DiDonato.

LAURENCE, J. The Revere retirement board (board) appeals from an adverse Superior Court judgment that affirmed a decision of the Contributory Retirement Appeal Board (CRAB) awarding disability retirement benefits to former Revere police Officer Alfred DiDonato. DiDonato had sought the benefits on account of a left knee injury that he suffered when he slipped and fell while scraping snow off his police car during work in December, 1977. Incorporating the findings and conclusions of an administrative magistrate's recommended decision as its own, CRAB reversed the board, which had refused to award benefits to DiDonato. The board had acted negatively despite a medical panel report in DiDonato's favor certifying that he was unable to perform the duties of his job, that this disability was likely to be permanent, and that the disability might be the natural and proximate result of the personal injury DiDonato had suffered in December, 1977.

On judicial review, a "decision of CRAB may be set aside only if based upon an error of law or unsupported by substantial evidence." *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 636 (1985). We agree with the board that CRAB's decision here — which rested entirely on a defective medical panel certification and an erroneous recommended decision by its magistrate — suffered from both infirmities and that the award of benefits to DiDonato must be reversed.

Recounting only the highlights of this tortuous controversy is a lengthy exercise but is necessary to provide a comprehensive backdrop for our decision. (We base this rehearsal upon

the magistrate's findings and other uncontested evidence in the record.) Experiencing continuing problems with his knee following the December, 1977, fall, DiDonato first consulted an orthopedic specialist, Dr. Sakellarides, in September, 1978. In November, 1978, Dr. Sakellarides recommended that DiDonato undergo a surgical procedure known as arthroscopy which, the doctor advised, could thoroughly explore and correct his condition, a torn medial meniscus. The Revere police department (department) granted DiDonato a six-month leave of absence in November, 1978, to have the arthroscopy.

For reasons unexplained in the record, DiDonato never had the surgery, despite remaining out of work for the entire six-month period. DiDonato thereafter returned to light duty but in August, 1979, ceased working for the department. In February, 1980, DiDonato fell on two occasions, both times reinjuring his left knee. In March, August, and September, 1980, Dr. Sakellarides again recommended the surgery, but DiDonato continued to refuse to undergo the procedure. The record sheds no light on the reasons for DiDonato's persistent rejection of the recommended medical treatment.

DiDonato filed for accidental disability retirement in November, 1980, pursuant to G. L. c. 32, § 7. A regional medical panel examined him in February, 1982, and two of the three physicians certified that he satisfied the three statutory requirements: incapacity, permanency, and proximate, work-related cause. The board nonetheless denied DiDonato's application in June, 1984. On DiDonato's appeal to CRAB, pursuant to G. L. c. 32, § 16(4), an administrative magistrate in June, 1985, recommended (and CRAB agreed) that the matter had to be remanded for a new medical panel evaluation because of various deficiencies in the examination by the first panel.

Prior to the convening of the new panel, DiDonato was twice examined by another orthopedist, Dr. Shah, at the insistence of the board. Dr. Shah concluded in January, 1986, that arthroscopy and proper rehabilitation would restore DiDonato to full police duties, with only minor risk from the

surgery. The new medical panel examined DiDonato in February, 1986, and provided a unanimous affirmative answer to the three statutory issues in his favor. In their accompanying letter report, they acknowledged that DiDonato was not totally disabled by his chronic left knee problem and could be "normally active"[2] but was permanently disabled with respect to the specific duties and responsibilities of Revere police work. The panel added that DiDonato had "contributed to his disability by disregarding Dr. Sakellarides' advice for these many years."

This observation piqued the board to demand additional information from the medical panel before deciding DiDonato's application. Through the Division of Public Employee Retirement Administration (PERA), which has overall responsibility for monitoring and promulgating regulations for all public retirement systems, see G. L. c. 7, § 50, the board asked the panel to expound about several subjects. The most significant areas of inquiry were the benefits, likelihood of success, and the risks associated with the surgical procedure recommended by Drs. Sakellarides and Shah; the reasonableness of DiDonato's refusal to undergo the procedure; and the effect of that refusal on his condition.

In May, 1986, the panel responded that "immediate surgery as recommended by Doctor Sakellarides would have had a negligible [risk][3] to life with the probability that [DiDonato] could have returned to active duty in three to four months. Now, six and [one]-half years after the injury, it is unlikely that surgery would terminate his disability." The panel failed to opine further regarding the impact of DiDonato's unwillingness to follow medical advice. They asserted that he "had the right to decide for or against surgical

---

[2]Since his departure from the department, DiDonato has for many years run a full-time security business, installing and maintaining alarms and other home and business security systems.

[3]The panel's May, 1986, letter contained the word "worth" rather than "risk," but the latter was clearly intended because the statement was specifically responding to the board's inquiry as to the risks of the recommended surgery, and the former is manifestly inappropriate in the context.

invasion of his body," but they also noted that "[i]nitially the benefits of the treatment far outweighed the risks involved."

In November, 1986, the board determined that the medical panel appeared to have applied incorrect standards in reaching their conclusion as to the permanence of DiDonato's disability and petitioned PERA to have him examined and evaluated by yet another medical panel.[4] PERA scheduled such a new panel for January, 1987. DiDonato refused to cooperate with this additional procedure and launched a declaratory judgment action in the Superior Court on the ground that the board's delay in rendering a timely decision as required by G. L. c. 32, § 7(6), amounted to the constructive granting of his application. That action was ultimately dismissed because of the pendency of the ad-

---

[4]The board's dissatisfaction with the panel's findings stemmed in part from a September, 1985, letter the board had received from PERA, which had stated, with respect to the determination whether an applicant for accidental disability retirement was permanently disabled:

"It is well established that a member who does not accept reasonable medical treatment can not be considered eligible to receive a disability pension based upon the medical impairment for which he has refused treatment. It has been the position of this Division that where an incapacity can be removed by operation of simple character or other treatment that does not involve serious suffering or danger, such treatment may be reasonable. In order to make such a determination as to whether treatment is reasonable, one should balance the extent of pain, suffering, and inconvenience involved in the treatment against the tangible benefits to the individual's condition. Other variables which may be considered include risk and likelihood of success."

PERA's position in this respect was based upon its Standard Rules for Disability Retirement that govern disability proceedings, particularly 840 Code Mass. Regs. § 10.04(3)(b) (1983), which provides as to the "permanence" determination that retirement boards must consider "[w]hether the nature of the condition or injury is such that it could be expected to improve if the member were willing to undergo reasonable medical treatment or rehabilitation therapy." These standard rules came into existence in 1983 and, being procedural rather than substantive in nature and effect, applied to DiDonato's pending application thereafter (a fact which DiDonato does not contest). See *City Council of Waltham* v. *Vinciullo,* 364 Mass. 624, 626-627 (1974); *Brookline* v. *Commissioner of the Dept. of Envtl. Quality Engr.,* 387 Mass. 372, 279 (1982); *Solomon* v. *School Comm. of Boston,* 395 Mass. 12, 16 (1985); *Warcewicz* v. *Department of Envtl. Protection,* 410 Mass. 548, 550 (1991).

ministrative proceeding. In October, 1988, DiDonato demanded in writing that the board render a decision on his application within thirty days. Receiving no answer, he appealed from the board's inaction to CRAB in December, 1988. After a brief hearing in October, 1989 (at which only DiDonato testified, and all the relevant medical evidence was documentary), the same administrative magistrate who had heard DiDonato's 1985 appeal recommended in December, 1989, that DiDonato be awarded accidental disability benefits.

The magistrate ignored the authority of PERA's regulation, 840 Code Mass. Regs. § 10.04(3) (1983), and of PERA's expressed position regarding rectifiable medical conditions, see note 4, *supra*, as well as a 1983 CRAB decision expressing similar views on the issue of permanence.[5] She held that an applicant "cannot be compelled to undergo surgery as a condition precedent to a determination as to the permanency of his disability," at least where he "has never been guaranteed a cure or significant abatement of his condition." Without reference to any supportive evidence in the record as to relative risks and benefits, the magistrate stated that, without such a guarantee, it was "demanding too much

---

[5]In 1985, the magistrate had stated, in the course of recommending a remand: "In regard to the impact of . . . [DiDonato's] refusal to undergo surgery, on the permanency determination . . . [CRAB] in *Krasco* v. *Mass. Port Authy. Retirement Bd.*, CR-6479 (August 1, 1983) considered as not permanent, a condition which medical expertise finds would probably be successfully cured or abated with surgery. The Medical Panel must determine not only this matter, but whether there is a risk to an applicant in undergoing the procedure. . . . [DiDonato is] entitled to have his November 1980 filing determine the effective date of an accidental disability retirement award." By December, 1989, the magistrate had decided that *Krasco* was inconsistent with "a long line of prior CRAB decisions" that had held that an applicant "cannot be compelled to undergo surgery as a condition precedent to a determination as to the permanency of his disability," and intimated that the language of *Krasco* had been limited by CRAB to mitigation of damages situations. No accessible authority was cited by the magistrate for this suggestion. Cf. *Perry* v. *Commissioner of Corps. & Taxn.*, 5 Mass. App. Ct. 780, 781 (1977) (unexplained inconsistency in interpreting statute that agency is charged with enforcing deprives present agency view of the weight normally accorded to agency interpretations).

of [DiDonato] to have to take on the risks of spinal or general anesthesia" as well as the risks of the knee surgery that had been recommended by Drs. Sakellarides and Shah. In addition, the magistrate asserted that "[t]he record reveals no other cause for the knee condition except for the [1977] fall at work." She concluded that the medical panel had "produced a proper certificate in the affirmative," that the panel had committed "no error," and that "all G. L. c. 32, § 6(3) and § 7(1) criteria [which DiDonato had the burden to satisfy] have been satisfied by reliance upon that Panel evaluation."

In March, 1990, CRAB endorsed and incorporated as its own the magistrate's findings and recommended decision, and it instructed the board to grant DiDonato accidental disability benefits. On the board's timely complaint for judicial review pursuant to G. L. c. 30A, § 14, a Superior Court judge affirmed CRAB's decision, stressing the correctness of the magistrate's conclusions.[6]

In this view, the judge erred. The magistrate's ultimate causation determination rested unstably on two defective legs: her finding that the "record reveals no other cause for the knee injury except for the [December, 1977] fall at work"; and her conclusion that all the statutory issues that

---

[6]The thirteen-year odyssey of DiDonato's disability claim proceeding (thus far) merits comment. Much of the delay in resolving this controversy appears to have been the responsibility of the board, which at various critical junctures failed or refused to act for inordinate periods of time and for reasons unexplained, or inadequately explained, in the record. The board comes before us with a negative equity on this score. But, while persistently (and with justification) decrying the board's "dilatory" and "evasive" tactics, DiDonato has never attempted to translate the board's misconduct in this respect into a legal issue, except in the aborted declaratory judgment action. A disability claimant's apparent inability to enforce a retirement board's obligation to act in a timely manner, see G. L. c. 32, §§ 6(4) & 7(6), may suggest the desirability of statutory amendment, along the lines of either G. L. c. 111, § 25C, or G. L. c. 40A, § 9, or G. L. c. 41, § 81P. In any event, our decision in the board's favor is in no way to be regarded as an endorsement of the board's indefensible slackness in handling DiDonato's application. Were it within our power, we would be inclined to impose sanctions on such administrative foot-dragging; but at the appellate level, at least, the board has acted unexceptionably.

DiDonato had the burden of proving, see *Adams* v. *Contributory Retirement Appeal Bd.*, 414 Mass. 360, 365 (1993) — disability, permanence, and work-related causation — had been established by the medical panel's certification.[7] The finding that no other cause existed in the record is inconsistent with the undisputed facts, earlier recognized by the magistrate herself, that DiDonato had suffered two falls injurious to his left knee long after leaving the Revere police force.[8] The magistrate's disregard of such pertinent information mirrored that of the medical panel, which ignored the facts of DiDonato's subsequent injurious falls, thereby neglecting their duty to "review . . . all the pertinent facts." *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. 611, 617 (1961). See G. L. c. 32, §§ 6(3)(a), 7(1). The panel's certification was consequently premised on an improper standard of causation that did not accurately reflect the evidence before it. See *McLean* v. *Medford*, 340 Mass. 613, 617 (1960). Cf. *Zavaglia* v. *Contributory Retirement Appeal Bd.*, 345 Mass. 483, 486-487 (1963). The decision of the magistrate (and CRAB), resting entirely on that erroneous panel opinion, is thus derivatively erroneous.[9]

---

[7]A medical panel's findings as to permanence and causation are not conclusive on the local board or CRAB but only stand as "some evidence" on those issues. "The final determination . . . whether [they have been] proved [is] reserved to [CRAB], based on the facts found and all the underlying evidence, including both the medical and nonmedical facts." *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 483 (1985). Here, the administrative magistrate essentially forwent her prerogative of independent decision beyond the purview of the panel evaluation and instead rested, virtually entirely except for the finding referred to above, on the panel's product, concluding that "there is no error on the part of the [medical] Panel and . . . all G. L. c. 32, § 6(3) and § 7(1) criteria have been satisfied by reliance upon that Panel evaluation. . . ."

[8]The board is correct in arguing that the magistrate's 1989 finding that DiDonato's subsequent falls occurred at work was erroneous, being inconsistent with both the record evidence and the magistrate's own findings in 1985, as well as DiDonato's testimony.

[9]The medical panel's inadequacies with respect to the issue of causation appear directly attributable to its failure to follow the explicit instructions it received on the form prescribed by PERA, pursuant to G. L. c. 32, § 6(3), and 840 Code Mass. Regs. § 10.10(5)(1983). In addition to a general admonition that the panel "should be as expansive as possible," that

The magistrate's causation finding also overlooked (inexplicably, given the magistrate's 1985 acknowledgement of its relevance and the medical panel's own final observation in February, 1986) DiDonato's unremitting refusal to undergo recommended surgery as having constituted a possible contributing, aggravating, or even primary cause of his eventual disability. The board was legally correct in insisting that DiDonato's refusal to have rehabilitative surgery and the medical implications of that refusal were relevant considerations which had to be factored into the causation analysis. The Standards for Decision governing accidental disability retirement proceedings called for a determination "[w]hether . . . other causal factors might have contributed to or resulted in the disability claimed; [and] whether . . . any other event or condition other than the accident . . . upon which the disability retirement is claimed . . . might have contributed to or resulted in the disability claimed." 840 Code Mass. Regs. § 10.04(4)(c) (1983).

The magistrate, accordingly, committed legal error in concluding that DiDonato had satisfied "the strict causation standard imposed by the controlling statute," *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 485 (1985), since she neglected to consider significant factors that might have relegated the original 1977 fall to a mere "contributing cause," rather than the requisite "natural and proximate" cause, of DiDonato's disability. See *Campbell* v. *Contributory Retirement Appeal Bd.*, 17 Mass. App. Ct. 1018, 1019 (1984).

The magistrate's asserted reliance on the panel's certification on the issue of causation was fatally inapt. It failed to

form specified that the panel's response as to causation address any other events or conditions (other than the personal injury sustained on account of which retirement is claimed) that might have contributed to the claimed disability. If there is such a condition or event, the form requires a statement assessing "the likelihood that the . . . disability . . . was the natural and proximate cause of that [other] event or condition" and a statement "whether it is more likely that the disability was caused by the personal injury sustained . . . which is the basis for the disability claim than the [other] condition or event . . . and the basis for your conclusion."

come to grips with the panel's somewhat cryptic but tantalizingly significant observation that DiDonato's unexplained flouting of his physician's treatment advice for many years (particularly at a time when the benefits of such treatment far outweighed the risks and the probable result would have been speedy restoration to active duty) had "contributed to his disability." No evidence appears in the record contrary to those panel observations. The only relevant record evidence, that of Dr. Shah, supports them. No proper finding as to causation could, under the pertinent regulations, ignore such a relevant factor.

In light of the panel report's ambiguity regarding causation and the material evidence in the record contrary to the magistrate's assertion that the 1977 fall at work was the sole cause of DiDonato's disability, the magistrate's (and CRAB's) implicit causation conclusion was both factually and legally unwarranted. DiDonato did not successfully discharge his burden of proving a permanent disability "by reason of a personal injury sustained . . . as a result of, and while in the performance of, his duties at some definite place and at some definite time." G. L. c. 32, § 7(1), as inserted by St. 1945, c. 658, § 1.

The magistrate's conclusions regarding the issue of permanence were similarly incorrect. There was no evidence in the record as to the basis for DiDonato's refusal to follow his physician's advice regarding restorative treatment or as to the presence of unusual or serious medical risks associated with the recommended procedures (including the administration of anesthetics). Nonetheless, citing no supporting authority, and in the face of contrary CRAB authority (see note 5, *supra*), the magistrate held that a disability claimant had the absolute right to refuse available medical treatment that would probably successfully eliminate the disabling condition (i.e., render it not permanent) unless the applicant could be "guaranteed" a cure without risks. Such a novel proposition finds no precedential or policy support.

While guaranties of cure are not wholly unknown to the law, see *Hawkins* v. *McGee*, 84 N.H. 114 (1929), our courts

have been rightly skeptical about contracts, let alone guaranties, regarding the outcome of medical treatment, given "the uncertainties of medical science and the variations in the physical and psychological conditions of individual patients[.] [D]octors can seldom in good faith promise specific results. Therefore it is unlikely that physicians of even average integrity will in fact make such promises." *Sullivan* v. *O'Connor*, 363 Mass. 579, 582 (1973). Consequently, our law has long recognized that risks are inherent in all surgical procedures, see *Harnish* v. *Children's Hosp. Med. Center*, 387 Mass. 152, 156 (1982), and that physicians are not expected to "warrant a cure," *Riggs* v. *Christie*, 342 Mass. 402, 406 (1961), but rather only to "exercise the care and skill of the average qualified practitioner [or specialist]." *Simmons* v. *Yurchak*, 28 Mass. App. Ct. 371, 377 (1990). The magistrate exalted the patient's right of self-determination to a point that placed "unrealistic and unnecessary burdens on practitioners" and ignored the need to reach a "reasonable accommodation" between the two societal interests. *Precourt* v. *Frederick*, 395 Mass. 689, 694-697 (1985).

The logic of the magistrate's holding on the issue of treatment refusal would also place an unrealistic and unnecessary burden on the entire retirement system. It would allow benefits to be granted to those claimants who unreasonably refused standard or routine medical treatment that is not inherently dangerous and that would probably effect a cure by rendering a disability temporary,[10] thereby rewarding malingering and possibly encouraging abuse. Those with minor disabling injuries could, on the magistrate's view, obtain benefits simply by leaving their injuries untreated. If ever a legal situation merited application of the classic saw, "to state the

---

[10]The only evidence in the record on the subject of the medical risk of surgical procedures was to the effect that the treatment advised for DiDonato was relatively minor, able to be performed on an out-patient basis, and attended by minimal routine risk. The medical panel's truncated views regarding the risk-benefit calculus confirmed that evidence. Neither the magistrate nor CRAB could use acknowledged expertise to substitute for that record evidence. See *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 305, 309-310 (1981).

proposition is to refute it" (*The Employers' Liab. Cases*, 207 U.S. 463, 502 [1908]), this might well be it.

Fortunately, we need not resort to that striking but dubious maxim in order to reject the uncontrollably subjective factor the magistrate effectively made outcome-determinative. Once again, the board was legally correct in insisting that the permanence determination could only be made after considering "[w]hether the nature of the condition or injury is such that it could be expected to improve if the member were willing to undergo reasonable medical treatment or rehabilitation therapy." 804 Code Mass. Regs. § 10.04(3)(b)(1983).[11]

The magistrate's erroneous injection of the "guaranteed cure" standard into the proceeding and her disregard of the evidence in the record strikingly suggesting that DiDonato had for years unreasonably refused a relatively minor procedure that probably would have restored him to active duty were compounded by her unqualified reliance on the medical panel. Their permanence certification was multiply flawed. First, the panel failed, as with the causation issue, to follow the directions prescribed by PERA on the certification form. Those directions required that an affirmative answer to the permanence question to be accompanied by as "expansive [a statement] as possible," specifying:

> "whether, if the applicant was willing and able to undergo corrective surgery or invasive treatment, this fact would change your opinion that the disability is permanent. Explain. Please make specific reference to the risk

---

[11]The requirement that a claimant must submit to reasonable medical treatment not involving significant risks in order to receive benefits is applied in the related area of workers' compensation, see *Floccher's Case*, 221 Mass. 54, 55 (1915); *Snooks's Case*, 264 Mass. 92, 93 (1928); *Burns's Case*, 298 Mass. 78, 79 (1937); *Adams* v. *Contributory Retirement Appeal Bd.*, 26 Mass. App. Ct. 1032, 1035 n.1 (1989), as well as to Social Security disability claims. See 42 U.S.C. § 416(i)(1)(A) (1988); 20 C.F.R. § 416.930(c) (1993); *Lovelace* v. *Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *Dawkins* v. *Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).

involved and the likelihood of success of such surgery or treatment."

The panel's certification and accompanying report were erroneously silent regarding such matters. Nor did the panel's May, 1986, conclusory attempt at clarification, when prodded by the board and PERA, approach the degree of specificity as to risks and benefits required by PERA in the interest of a comprehensive and meaningful medical evaluation.

The ultimate finding as to permanence under the statute is a legal determination for CRAB. See *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 56, 61-62 (1959). The requirement of a medical panel evaluation and certificate in disability proceedings, however, reflects the legislative understanding that in each case there exist fundamental medical questions at the core of the disability issue that must be answered by medical experts. The medical answers to such questions "are beyond the common knowledge and experience" of local retirement boards and CRAB, "without which [answers those agencies] could not find the ultimate fact[s]" of permanence and causation. *Malden Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 1 Mass. App. Ct. 420, 423-424 (1973).

Identification of the medical risks and benefits attendant upon the medical treatment available and recommended to DiDonato was not within the competence of lay tribunals but rather depended upon scientific matters of the sort physicians are expected by society to address. Cf. *Harnish* v. *Children's Hosp. Med. Center*, 387 Mass. at 154-158; *Precourt* v. *Frederick*, 395 Mass. at 694-697. In the circumstances of this case, a detailed presentation and balancing of such facts and opinions were essential to a proper medical finding regarding the permanence of DiDonato's disability, as PERA's instructions made explicit. Their absence renders the medical panel's certification erroneously incomplete. As such, it could not serve as the proper condition precedent to an accidental disability retirement award required by G. L. c. 32, § 7(1).

To the extent the panel purported, in their May, 1986, supplement, to make medical findings as to risks and bene-

fits, their effort was inadequate for the further reason that it was unhelpfully imprecise. The panel declared that the medical treatment recommended for DiDonato would probably have restored him to active duty without significant risk if undertaken "immediately" or "initially" (possibly referring to the earliest recommendation by Dr. Sakellarides in November, 1978) but was "[n]ow . . . unlikely . . . [to] terminate his disability." This observation left unclear what the prognosis might have been either as of (or within a reasonable time after) November, 1980, the date DiDonato filed his application for disability benefits claiming to be permanently disabled (and the date that the administrative magistrate's June, 1985, decision stated would govern his entitlement to benefits); or as of the date of the first medical panel examination of DiDonato in February, 1982, which would have been determinative of the medical issues had that panel properly discharged their duty of investigating all the pertinent facts; or as of any other intermediate date prior to May, 1986. Since the board was entitled to an understandable certificate reflecting all the relevant facts and free of medical obscurity, the panel's report was in this respect ambiguously inadequate. See *McLean* v. *Medford,* 340 Mass. at 617.

The final defect in the panel's permanence certification was their application of an erroneous legal standard. See *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.,* 340 Mass. at 60. In concluding that DiDonato had an absolute right to refuse "surgical invasion of his body," and thereby failing to provide any considered views as to the reasonableness of DiDonato's position or the specific risks and benefits of the medical treatment offered him, the panel effectively deemed it to have been wholly irrelevant to the issue of permanence. This was contrary to PERA's explicit instructions and the pertinent regulations. The panel's error was so wholeheartedly embraced by the magistrate that it tainted her implicit conclusion that DiDonato had proved it was the December, 1977, incident, rather than his own unjustified inertness, that had produced an "incapacity . . . likely to be permanent."

Normally, a deficient CRAB decision would be remanded for further proceedings before CRAB. See *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 463-464 (1985); *Adams* v. *Contributory Retirement Appeal Bd.*, 26 Mass. App. Ct. 1032, 1034-1036 (1989). Here, however, DiDonato insisted that he had a right to rely on the 1986 certification and report of the second medical panel. He refused the opportunity for and obstructed the obtaining of further medical evaluation of his case. He was supported in this position by the magistrate, who similarly determined that DiDonato's claim should stand or fall on the second medical panel's efforts. Given the effective stipulation that no additional facts or opinions on the causation and permanence issues need or should be considered, there is no occasion for a remand to CRAB in the unusual circumstances of this proceeding. The case is to be remanded to the Superior Court for entry of a judgment setting aside CRAB's decision and denying DiDonato accidental disability retirement benefits.[12]

*So ordered.*

---

[12]In view of our disposition, we need not address the board's additional arguments regarding CRAB's supposed lack of jurisdiction to hear DiDonato's appeal and improper decisional format (neither of which we deem to have merit in any event); and regarding the magistrate's exclusion of testimony from related court proceedings (an action that was within her broad discretion, which was not shown to have been abused).