Fecteau, J.
This is an appeal, by the plaintiff Carol McCarthy pursuant to M.G.L.c. 30A, §14, from the decision of the Massachusetts State Retirement Board (“Board”) that denied her application for an accidental disability allowance that she had sought under the provisions of G.L.c. 32, §7, and from the decision of the Contributory Retirement Appeal Board (“CRAB”) that upheld the Board’s denial of benefits. Although the plaintiff, in her complaint seeking judicial review, alleges that the defendants’ decisions were (1) based upon an error of law, (2) unsupported by substantial evidence, and (3) arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law, she argues in her motion for judgment on the pleadings[1] that the decision was based upon an error of law and it is unsupported by substantial evidence.
This matter came on for hearing on March 3, 2003, and taken under advisement at that time.
BACKGROUND
On or about February 14, 2000, the Board received from the plaintiff, an employee at the University of Massachusetts Medical Center from May 1988, to July 7, 1998, an application for accidental disability benefits filed pursuant to the provisions of G.L.c. 32, §7. (Administrative Record (herein “AR”), at 5-20.) The State Board of Retirement denied the application on or about January 25, 2001. (AR, 3.) An appeal was taken to the Contributory Retirement Appeals Board (“CRAB”), who referred the matter for hearing before the Division of Administrative Law Appeals. On January 18, 2002, the hearing officer issued her decision recommending affirmation of the decision of the State Board of Retirement. (AR, 174-87.) On May 16, 2002, CRAB adopted the findings and recommendation of the hearing officer and upheld the denial of accidental disability retirement benefits. (AR, 207-09.) The instant complaint followed, filed with the court on June 7, 2002.
The plaintiffs last relevant work for U. Mass. Medical Center was that of a payment processor. Among tasks expected to be performed by the plaintiff were data entry, bookkeeping, use of an adding machine and general clerical functions, including use of the telephone, the handling, filing, sorting and distribution of written materials and photocopying.
Alleged by her to have resulted from many years of repetitive use of her hands, especially her right hand, and the turning of her neck, she developed a case of carpal tunnel syndrome, which she first noticed in 1997, together with basil joint arthritis. It caused symptoms of pain in her right hand and arms, neck and shoulder. She first apparently gave written notice of injury to her employer on or about June 18, 1998, in which she described her injury as having occurred “over the course of years repetition of hand motion, keying, staple pulling, 1988 computer was positioned in comer of desk, having to keep turning neck to look at paperwork.” She described her injury in this form as “hand numbness and pain; neck ache and shoulder and headaches.” (AR, 35.) Her physician, William Morgan, M.D., first prescribed pain medication, splints and cortisone shots. In July 1998, she had endoscopic surgery for right carpal tunnel release and basal joint athroplasty. (AR, 46-47.)
Due apparently to her claim to have been experiencing a post-surgery increase in her symptoms related to carpal tunnel syndrome, especially in her arm, elbow and shoulder, a bone scan was performed in September 1998. (AR, 57-58.) This resulted in a confirmation of a diagnosis by Dr. Donald Stevens, to whom Dr. Morgan had referred the plaintiff due to her continued complaints of pain, of reflex sympathetic dystrophy. (AR, 151-52.) Another bone scan was conducted in May 1999, and upon comparison with the earlier study showed some lessening of the positive findings first noted in September 1998, but still indicative of moderate symptomology. (AR, 59-60.) She was examined by several physicians during 1999, apparently in connection with the workers’ compensation action, some of whom could not find objective evidence of orthopedic or neurological conditions nor any other basis for her subjective complaints of pain, while others supported her claim of disability.
After filing her application for accidental disability retirement a regional medical panel was convened to examine her on account of her application. It was composed of Drs. Groves (AR, 106-13), Sewall (AR, 114-20) and Ousler (AR, 98-105), all of whom conducted examinations of the plaintiff during July and August 2000. Dr. Groves found her to be totally and permanently disabled from her work and he consequently answered the three certificate questions in the affirmative. Drs. Sewall and Ousler found her not to be disabled. While he noted the positive finding from the September 1998 bone scan, Dr. Ousler did not comment on them or on Dr. Morgan’s diagnoses, but noted that he could not confirm the diagnosis of reflex sympathetic dystrophy by his examination in which he looked but could not find the “cardinal signs involving RSD,” nor confirm “her subjective history of significant hand pain” by “objective findings.” Likewise, Dr. Sewall noted the absence of signs of reflex sympathetic dystrophy and, while noting “cogwheel weakness of her right wrist on flexion and extension, and stiffness in finger joints,” found that the plaintiffs complaints “far outweigh any positive physical findings.” He concluded that he “would not think that she is disabled from being able to do her work as a computer operator” and that it was his “opinion that the member is physically capable of performing the essential duties of her job as described in the current job description.”
After additional documents were received by the Board, most notably a functional capacity evaluation *355 of the plaintiffs right hand, they were distributed to the members of the medical panel who were asked to examine them and to report whether their opinions were affected. (AR, 121.) Additionally, it was noted by the Board that Dr. Ousler’s report showed some internal inconsistency with respect to his opinion of disability and it wished for a clarification of his opinion.[2] All three responded to the request for an update to their reports concerning the functional capacity tests and all stated that the new reports did not change their opinions. (AR, 130-32.)

DISCUSSION

I. Standard of Review
The scope of review of an agency’s decision is defined by G.L.c. 30A, §14, citing Howard Johnson Company v. Alcoholic Beverages Control Commission, 24 Mass.App.Ct. 487, 490 (1987). Pursuant to G.L.c. 30A, §14(7) the court may either affirm, remand, set aside or modify an agency’s decision “if it determines that the substantial rights of any party may have been prejudiced because the agency’s decision is:
(c) based upon an error of law; ... or
(e) unsupported by substantial evidence; or
(f) unwarranted by facts found by the court on. the record as submitted . . .; or
(g) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.
According to G.L.c. 30A, §1(6), “substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.”
The party appealing an administrative decision bears the burden of demonstrating the decision’s invalidity. Merisme v. Board of Appeals on Motor Vehicle Liab. Policies and Bds., 27 Mass.App.Ct. 470, 474 (1989); also Faith Assembly of God v. State Bldg. Code Comm’n, 11 Mass.App.Ct. 333, 334 (1981). In reviewing the agency’s decision, the court is required to give due weight to the agency’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992); Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n., 401 Mass. 713, 721 (1988). The reviewing court may not substitute its judgment for that of the agency. Southern Worcester County Regional Vocational School Dist. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982). A court may not dispute an administrative agency’s choice between two conflicting views, even though the court would justifiably have made a different choice had the matter come before it de novo. Zoning Bd. of Appeals of Wellesley v. Housing Appeals Comm’n, 385 Mass. 651, 657 (1982).
The court does not act as a de novo finder of fact, nor is the review a trial de novo on the record that was before CRAB. Fergione v. Director of the Division of Employment Security, 346 Mass. 281, 283 (1985). The court must show deference to the experience, technical competence and specialized knowledge of CRAB, as well as to the discretionary authority conferred upon it. McCarthy v. Contributory Retirement Appeal Board, 342 Mass. 45, 48-49 (1961). As the courts have noted, “retirement law is notoriously complex” and “CRAB is charged with interpreting G.L.c. 32.” Namoy v. Contributory Retirement Appeal Board, 19 Mass.App.Ct. 456, 463 (1985). Great weight must be placed on the Department’s evaluation, and its decision must be affirmed even though elements of the case might have supported a contrary decision had the matter been brought before this Court for trial de novo. Southern Worcester County Regional Vocational School District v. Labor Relations Commission, 386 Mass. 414, 420-21 (1982).
In order for the plaintiff to obtain accidental disability retirement benefits under G.L.c. 32, §7(1), she must prove permanent and total disability: “disability” meaning total and permanent incapacity for further duty, and “incapacity” meaning the substantial inability to perform the duties of her regular job or work. Quincy Retirement Board v. Contributory Retirement Appeal Bd., 340 Mass. 56, 60 (1959). Not only must the medical panel that is convened, but also her supporting physician answer the three certificate questions: (1) is the applicant mentally or physically incapable of performing the essential duties of her job as described in the current job description, (2) is such incapacity likely to be permanent, and (3) is the disability such as might be the natural and proximate result of the injury or hazard undergone that forms the basis of the retirement claim. A panel’s negative response to any question must be overcome by the applicant by proof that the panel lacked pertinent facts or employed an erroneous standard. Retirement Board of Revere v. Contributory Retirement Appeal Bd., 36 Mass.App.Ct. 99, 106 (1994). “A certification of incapacity is a condition precedent to accidental disability retirement by the local board.” Quincy Retirement Bd. v. Contributory Retirement Appeal Bd., 340 Mass. 56, 60 (1959), citing Cassier v. Contributory Retirement Appeal Bd., 332 Mass. 237, 240, 124 N.E.2d 516; Hunt v. Contributory Retirement Appeal Bd., 332 Mass. 625, 627, 127 N.E.2d 171; Mathewson v. Contributory Retirement Appeal Bd., 335 Mass. 610, 613-14, 141 N.E.2d 522. “This statement must mean that in such cases the county board cannot allow an accidental disability retirement application in the absence of the ‘certification of such incapacity,’ but the board is not required to follow it when the board has it.” Id., at 613.
The plaintiff contends that the regional medical panel employed an erroneous standard and/or lacked pertinent facts which infected the decision of the Board and CRAB as a matter of law due to its perceived lack of pertinent facts and that the panel utilized an improper standard by its having failed to inquire as to the physical duties of her job, internal inconsistency in their findings of no objective signs of disability on examination, while also noting that she had limitations, as *356 well as inconsistency with or failure to discuss contrary findings by the plaintiffs examiners or those finding in support of her contentions. Additionally, the plaintiff complains that the report of one of the members of the medical panel, Dr. Ousler, was noted by the Board to be internally inconsistent with a request being made by the Board to P.E.R.A.C. to ask for a clarification of his opinion concerning permanent incapacity. The plaintiff also contends that Dr. Ousler misinterpreted the functional capacity results and that such misunderstanding was incorporated into the magistrate’s findings and rulings when she found that the degree of impairment found was 15% of the hand, rather than the 23% of the hand and 15% whole body disability actually reported.
First, as regards the plaintiffs claim that the majority members of the medical panel misunderstood or minimized the repetitive nature of the physical tasks that the plaintiffs job requires, her job description was given by her employer and by her on forms submitted to the panel for their review; indeed, they certified that they considered her job description. She described in her application that her job requires 7V2 hours per day use of a keyboard, phone, pulling files and writing and that she would be unable to perform the “constant use of the keyboard, holding phone, unable to grip wide files, pain in holding a pen to [sic] long, cannot pick up very small objects, fixing a printer tape.” In addition, she described the reasons for her disability as including the “constant keying on a computer, daily staple pulling by the hundreds, computer position in a comer having to sit at an angle, counting and adding hundreds of checks daily, adding these checks on an adding machine, having to pull files that are were wide from cardboard files, staple of batches that were large.” That the examiners described her duties with less precision, or that their description appears that they considered her job less physically demanding than she, does not equate to a lack of facts or reliance upon an erroneous standard. As experienced orthopedic examiners who are called upon to make evaluations of patients for work capacity routinely, it would come within their usual and customary basis of knowledge as to the physical tasks associated with various occupations, including a bookkeeping/clerical position like that held by the plaintiff. Moreover, it is clear from the findings of fact of the hearing officer that the full extent of the plaintiffs position was not misunderstood, especially as regards the repetitive nature of these tasks.
The plaintiff also complains that the findings and opinions of the majority members of the panel failed to discuss or reconcile the contrary findings of the plaintiffs treating physicians or the positive test results that support her claim, such as the bone scans, work capacity and functional capacity evaluations. However, it is again dear that, as a general matter, all pertinent medical records were provided to the panel members. That they have chosen to concentrate in their reports on explanations in support of their ultimate opinions and have not offered reasons why contrary evidence should be disregarded or distinguished, such as a legal writer might choose to do, does not amount, by itself, to a legally fatal flaw. The fact that the panel received reports indicative of some objective signs supportive of injury does not equate to or compel a finding of disability, for certainly symptoms may exist and objective findings may exist that do not amount to disability for work. The plaintiff appears to suggest, also, that because a treating physician finds disability, an examining panel must accord such opinion conclusive weight in their determination. The applicable law does not accord the opinions of treating physicians any higher evidentiary value nor are their opinions given presumptive weight in the determination by the panel members of their findings and opinions.
Of greater significance to this review, however, is the apparent lack of a final and clearly-stated majority opinion in connection with the disability of the plaintiff together with the misinterpretation by Dr. Ousler that found its way into the decision of the hearing officer. Moreover, as the plaintiff points out, the hearing officer has apparently offered a medical opinion that is not supported in the record, namely, that a “lessening” or improvement of a condition as seen on a bone scan equates with an “abatement” of that condition. Lastly, the Board acted prior to receiving any clarification from Dr. Ousler and, while he did offer an update, after the fact, concerning the functional capacity evaluation, he never sought to explain how his negative response to the first certificate question regarding incapacity can be reconciled with an opinion that she would be unable, for the next four to six months, to perform some of the substantial tasks associated with her position. This latter inconsistency was of such apparent significance to the Board that it requested, through its counsel, the appointment of another medical panel member for another examination.
The Board contends, and as was noted in the decision of the hearing officer, that the applicant’s own physician has not supported her application with unequivocal opinions of permanence and a causal relationship between her condition and the hazards of the physical demands of her job. In particular, in the only reference to any relationship between her job and her condition, Dr. Morgan wrote, in January 2000, that “she was noted to be having difficulty with her thumbs when performing pinching activities, particularly during work related procedures as her job in a clerical staff.” Also, in connection with his opinion of permanence, he wrote: “[gi]ven these continued complaints about the right hand and the presence of persistent arthrofibrosis, I do not believe Mrs. McCarthy is capable of returning to her prior clerical activities and I think it is unlikely that she will be capable of doing so sometime in the near future.” While his report that accompanied her application is not a model of definitiveness, it did accompany his certificate, in which he answered all of the three *357 critical questions in the affirmative. Moreover, he concluded his report with the opinion that “she is incapable of performing repetitive and persistent activities, such as keyboard, writing, etc, with the right upper extremity and essentially is capable of performing one-handed work with the left upper extremity.”
While the report from her treating physician appears lacking in detail, bordering on silence, on the issue of causal relationship, which is the third of three certificate questions, the majority finding of the regional medical panel, upheld by the retirement board, did not reach causal relationship, finding that the plaintiff was not disabled.[3] It may be that the board, and CRAB, may ultimately decide and be warranted in denying the plaintiffs application on the ground that she has failed to sustain her burden to show causal relationship between her condition and the hazards of employment. However, while the board retains the discretion to overrule an affirmative finding of causal relationship by the medical panel,[4] it was premature to do so prior to the medical panel having reached that issue. As was stated in the case of Malden Retirement Bd. v. Contributory Retirement Appeal Bd., 1 Mass.App.Ct. 420 (1973):
[t]he parties in the present case agree that the affirmative answers to parts (1) and (2) supplied by the medical panel tumished a necessary basis for the local board (or the Appeal Board) to give further consideration to Cronin’s retirement application. [(FN6: It is clear that affirmative answers to parts (1) and (2) are not conclusive and binding on the local board. However, a negative response to either part precludes the allowance of the application unless an erroneous standard was applied by the medical panel. Quincy Retirement Bd. v. Contributory Retirement Appeal Bd., 340 Mass. 56, 60, 162 N.E.2d 802 (1959).] The apparent purpose of the requirement for such affirmative answers is to vest in the medical panel the responsibility for determining medical questions which are beyond the common knowledge and experience of the members of the local board (or the Appeal Board) . . . Part (3) of the medical certificate serves a purpose similar to that discussed with regard to parts (1) and (2), i.e., it provides an effective vehicle for determining the preliminary medical question which would normally be beyond the competence of the local board. The local board’s fact-finding responsibility is not usurped, because part (3) of the medical certificate as defined in §6(3)(a) supplies necessary medical fact without which the local board (or the Appeal Board) could not find the ultimate fact of causal connection.
Id. at 423-24.
Thereafter, in the case of Retirement Bd. of Revere v. Contributory Retirement Appeal Bd., 36 Mass.App.Ct. 99 (1994), this subject was again discussed:
[t]he ultimate finding as to permanence under the statute is a legal determination for CRAB. See Quincy Retirement Bd. v. Contributory Retirement Appeal Bd., 340 Mass. 56, 61-62, 162 N.E.2d 802 (1959). The requirement of a medical panel evaluation and certificate in disability proceedings, however, reflects the legislative understanding that in each case there exist fundamental medical questions at the core of the disability issue that must be answered by medical experts. The medical answers to such questions “are beyond the common knowledge and experience” of local retirement boards and CRAB, “without which [answers those agencies] could not find the ultimate fact[s]” of permanence and causation. Malden Retirement Bd. v. Contributory Retirement Appeal Bd., 1 Mass.App.Ct. 420, 423-24, 298 N.E.2d 902 (1973).
Id. at 111.
Notwithstanding that the Board has discretion to disregard a medical panel’s affirmative answer to question no. 3, it is still some evidence for the board to consider, when the evaluation reaches that point in the application process. Here, it had not done so. Therefore, prior to an examination of the issue of causal relationship, it is appropriate to examine the sufficiency of the board’s finding of a lack of disability.
If the panel responds in the negative to any of the three parts of the medical certificate, CRAB is not permitted to substitute its opinion for that of the panel unless the panel has employed an erroneous standard. Malden Retirement Bd. v. Contributory Retirement Appeal Bd., 1 Mass.App.Ct. 420, 424 (1973). However, CRAB may not affirm the decision of the state board on a negative certificate without giving the applicant an opportunity to show that the medical certificate was plainly wrong or made without conforming to the required procedure of physical examination and review of the pertinent facts. Kelly v. Contributory Retirement Appeal Bd., 341 Mass. 611, 617 (1961). If a CRAB decision rests entirely on an erroneous opinion of the medical panel, it is erroneous as a matter of law. Noone v. Contributory Retirement Appeal Bd., 34 Mass.App.Ct. 756, 764 (1993). “If a negative certificate of a medical panel member is deficient because an incorrect legal standard has been applied by a physician, CRAB may consider all of the evidence, including the certificate, and conclude that the applicant has satisfied her burden on the question addressed by the legally flawed certificate. Kelly, supra, at 617, construing Quincy Retirement Bd. v. Contributory Retirement Appeal Bd., 340 Mass. 56, 61-62 (1959). An applicant has a right to tiy to persuade CRAB that the applicant should prevail on the whole record. Id. But when CRAB is not persuaded on the whole record in favor of the claimant where there is a defective negative certificate, CRAB cannot then deny the claim without providing an opportunity for the applicant to supply a certificate that is valid.” Ferraro v. Contributory Retirement Appeal Bd., Mass.App.Ct. No. 01-P-580, decided April 7, 2003.
Here, the state retirement board obviously had significant concern over the inconsistency within the certifi *358 cate and the narrative report from Dr. Ousler prompting it to request an examination by a new panel member, even without such a request from the applicant. The board’s request reflects a significant doubt concerning the adequacy of the opinion of one of the two majority members of the panel and the applicant ought to have been given the opportunity of supplying a legally adequate certificate. Moreover, although not “on all-fours” with the facts of Ferraro, supra, the action of the board in denying the plaintiffs application without receiving the report from a new member or prior to receipt of Dr. Ousler’s supplementation of his certificate, is sufficiently analogous to the situation in Ferraro to conclude that the board’s action was similarly flawed, based upon less than a majority decision of the medical panel. As was stated in the case of Retirement Bd. of Revere v. Contributory Retirement Appeal Bd., 36 Mass.App.Ct. 99, 112 (1994), “(s]ince the board was entitled to an understandable certificate reflecting all the relevant facts and free of medical obscurity, the panel’s report was in this respect ambiguously inadequate. See McLean v. Medford, 340 Mass. at 617, 166 N.E.2d 219.”
Moreover, the need for a complete and clear medical report from Dr. Ousler is required by the suggestion that he has found the plaintiff unable to perform some of the essential tasks of her job. In his report, while he states, on one hand, that she is “capable of returning to her former occupation as a clerk in the patients’ account department at University of Massachusetts Medical Center” he counters, on the other, by saying that “(t]he usage of her right hand may be initially limited in some activities of her job, which will require repetitive grasping or extended writing for a time period not to exceed 4 to 6 months.” (AR, 105.) Given that Dr. Ousler’s negative response to certificate question no. 1, regarding disability, obviated the need for him to answer question no. 2, concerning permanence, one can understand the reason the Board was interested in a clarification, as he appeared to be suggesting, by this response, an incapacity to perform some essential tasks, in conflict with his opinion on disability, but that it would extend only for a limited period of time into the future. In the case of Retirement Bd. of Brookline v. Contributory Retirement Appeal Bd., 33 Mass.App.Ct. 478, 484-85 (1992), it was stated:
A certification of incapacity is a condition precedent to accidental disability retirement by the local board . . . Here the medical panel based its refusal to certify disability upon the fact that [the claimant] was able to do sedentary work, although he was unable to engage in the usual duties of a lieutenant in fighting fires. We agree with the appeal board that in so doing the local board applied an incorrect standard of law. “Disability” is defined in §7 as total and permanent incapacity “for further duty.” We think it a fair reading of the statute that the incapacity referred to is the substantial inability of an applicant to perform the duties of his particular job or work of a similar nature or for which his training and qualifications fit him.
[Citing Quincy Retirement Bd. v. Contributory Retirement Appeal Bd., 340 Mass. 56, 60 (1959).]
Dr. Ousler’s narrative report in support of his certificate responses, therefore, appears to have applied, similarly as in Retirement Board of Brookline, supra, an incorrect standard of law, and must, therefore, be disregarded. Consequently, as with Ferraro, supra, the medical panel lacked a proper majority and, therefore, was not a proper basis upon which a decision of the Board, and consequently that of CRAB to rest. The decision of CRAB and of the State Retirement Board must, therefore, be annulled and the matter remanded for purposes of the convening of a new medical panel.
ORDER FOR JUDGMENT
For the foregoing reasons, the decision of the Contributory Retirement Appeal Board is ANNULLED. The plaintiffs motion for judgment on the pleadings is ALLOWED. A Judgment on the pleadings shall be entered in favor of the plaintiff and the matter is to be REMANDED to the State Retirement Board for appointment of and examination by another regional medical panel and such other proceedings as may be required.

Pursuant to Standing Order 1-96 of the Superior Court, the plaintiff filed her Motion for Judgment on the Pleadings. The State Board of Retirement filed its opposition and was heard in opposition to the motion at the hearing. CRAB, as a nominal party, relies on the opposition of the State Board of Retirement.

The supplemental opinion of Dr. Ousler, dated February 21, 2001, was not received by the Board until after the issuance of its decision on January 25, 2001, but it does not offer any clarification concerning the inconsistency. It appears that it was reported to the Board that he was no longer accepting assignments from P.E.R.A.C., and implicit in the report to the Board was the suggestion that they should not expect to receive an update or further clarification from him. The Board, through its counsel, requested that P.E.R.A.C. order another single member examination. (See administrative record, at 173.) The record does not disclose any explanation as to why it was not conducted, nor how Dr. Ousler was informed of the request for an update and whether he received any request for clarification of the inconsistency noted by the Board.

As noted in the medical certificate, the panel member is instructed not to answer any question beyond a negative answer: therefore, upon a negative response to question 1, questions 2 and 3 are to remain unanswered.

“The medical panel’s certification as to the plaintiffs condition (that his disability ‘might be the natural and proximate result’ of a personal injury which the plaintiff sustained as a result of his employment) is not conclusive of the ultimate fact of causal connection but stands only as some evidence on the issue. Wakefield Contributory Retirement Bd. v. Contributory Retirement Appeal Bd., supra. The final determination in this case whether causation was proved was reserved to the appeal board, based on the facts found and all the underlying evidence, including both the medical and non-medical facts.” Blanchette v. Contributory Retirement Appeal Bd., 20 Mass.App.Ct. 479 (1985).